[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT MICROPATENT'S APPLICATION FOR PREJUDGMENT REMEDY
 Statement of the Case
The defendant Micropatent has applied for a prejudgment remedy against the three plaintiffs. The case has already achieved "oversize" status in part because counts 1, 4 5 have been ordered stricken in three separate judicial opinions. An examination of counts 2 and 3 suggests they are of questionable validity.
Of significance in the day and a half hearing on this application is the testimony of the plaintiffs and their explanations as to their having signed several documents relied on by Micropatent to support its defense of the suit.
In their complaint, the plaintiff's claim a patent for a labeling device is really theirs and that Micropatent has converted to itself their product.
Each of the plaintiffs admitted that they signed all of the documents in question, but the import of their testimony was that they did not read the documents or that they were coerced into signing them.
The plaintiffs also argue a lack of consideration for them to sign and urge the court to find that the property in dispute, a patent. is not covered by the documents because it was created after the usual business hours of Micropatent. All three plaintiff's and two additional "inventors" were employed by Micropatent at the time of the invention. CT Page 13436-af
 Facts
In 1993, Micropatent was producing compact discs to which descriptive labels were attached. This was done manually and required some care. It was also a slow process, susceptible to error.
The plaintiff Johnson came up with the basic idea for an applicator which worked quickly and efficiently. The plaintiff Casillo suggested some modifications which when applied produced an even better device.
It is unclear why the plaintiff Heath and the other two "inventors" were added to the patent application documents, but they were. All five persons were Micropatent employees and all five had signed a confidentiality agreement as a condition of employment or of continued employment.
Micropatent decided to pursue a patent application for the device and eventually spent in excess of $60,000 for drawings, applications, patent attorney's fees, etc.
On June 10, 1994, all three plaintiffs signed an agreement "In consideration of my employment or the continuance of my employment by Micropatent . . ."
Paragraph 5 of this agreement reads as follows:
 I hereby assign and agree to assign to the Company or its designee all my right, title and interest in and to all inventions, improvements, discoveries or technical developments, whether or not patentable, which I, solely or p jointly with others, may conceive or reduce to practice during the term of my employment and which are conceived or first actually reduced to practice (a) in the utilization by the Company of my services in a technical or professional capacity in the areas of research, development, marketing, management, engineering, or manufacturing, or (b) pursuant to any project of which I am a participant or member and that is either financed or directed by the Company, or (c) at the Company's expense, in whole or in part. All other inventions, improvements, discoveries or technical developments shall remain my CT Page 13436-ag property.
On July 25, 1994, as part of a first patent application, the plaintiffs signed a "combined declaration and power of attorney," filling in by hand the date and their home addresses.
On that same date, all five inventors, including the 3 plaintiffs, signed an assignment of their interests in the patent to Micropatent.
When a second patent application was filed in lieu of the first, the same parties executed a second set of documents, on or about April 3, 1995.
The completed labeling device was put into use at Micropatent in 1993 and the patent was issued in 1996.
The plaintiff Johnson resigned from Micropatent in September of 1994, Casillo left in 1995, and Heath was discharged in 1996.
By complaint dated June 5, 1997, the plaintiff's claim title to the patent, injunctive relief, damages and other relief. The defendants have counter-claimed and this application followed that filing.
 Discussion
The plaintiffs' claims appear to be:
I. That since they didn't read these documents, they, are not bound by them. They also claim they didn't understand the import of an "assignment."
II. There was a lack of consideration for their signing the documents.
III. The invention was prepared "after hours" and off the Micropatent premises and is thus excluded from the terms of the agreement.
 I
The premise that one can avoid the consequence of signing a document by claiming not to have read it is startling, to say the least. The endorsement of that notion by the courts would create chaos in every phase of this commercially driven society, and that is only the beginning! CT Page 13436-ah
While there are circumstances in which such a claim would be viable, this is not such a situation.
These are three adult males, born and raised in this country. Heath and Johnson have college degrees. Casillo is a high school graduate. All three were employed in a sophisticated field of endeavor involving computers and complex technology. Heath was born in 1951, Johnson and Casillo were born in 1968. Only Casillo even suggested that there was a scintilla of coercion involved in his signing. He said he was "rushed" and "frightened" and "wanted to go along."
The plaintiffs do not explain why they signed something with a description of "power of attorney" or "assignment" without asking a question — if they had one.
The court finds it interesting that the assignments bear five signatures and the five names of the signers, the so-called "inventors," are typed below the signature lines. One is puzzled as to why that fact did not cause these plaintiffs to ask a question about what was happening — assuming they were as uninformed as they allege.
Shedding further doubt on the plaintiffs' explanation of their actions is Exhibit C, an E-mail invitation to all five inventors, including Johnson, who had by this date, March 7, 1995, resigned. This invitation was for April 5, 1995 and invited the recipients to dinner at the Union League Café, one of New Haven's better restaurants, "to honor the extra effort you all provided in the Neato project" (the labeling item).
According to the plaintiffs, it was at the restaurant on April 5th
that they signed the last assignment (that word appears in large print at the top of the page, Exhibit 10).
The court's questions to the plaintiff Heath and his answers are significant in light of the position taken by the plaintiffs.
Referring to these signings, Mr. Heath indicated "And they said we've decided to' go forward with the patent. Would you please sign these?"
He was then asked: "So you were aware of the fact that this (the documents) had something to do with the patent?
The response was: "Yes, I was."
He was then asked: "When you signed the assignment, were you aware that CT Page 13436-ai it had something to do with the patent?"
Again, the response was: "Yes, I was." Heath subsequently affirmed that he knew Micropatent was going forward with the patent and that the assignment he signed dealt with the patent.
He also stated that he did not understand that he had signed away his rights to the patent.
The court must also comment on Exhibit 13, Mr. Johnson's letter of resignation to Micropatent. This hardly suggests a pathetic, put upon, befuddled employee. Rather, he sounds quite pleased with his employment experience and expresses his gratitude to Mr. Tracy, Micropatent's principal.
The court concludes that the plaintiffs' version of the circumstances surrounding their signing the documents in question is totally a fiction, illogical, and contrived. The court rejects the explanation in its entirety.
 II
On the issue of a lack of consideration, the court will ignore the issue raised by counsel that no plaintiff received the sum of one dollar as is recited in the preface to the two assignments in dispute.
The court finds ample consideration for the execution of the assignments by the p plaintiffs.
First, there are the so-called Confidentiality Agreements (Exhibits 1, 2 3) which outline the employees responsibilities and address the issues of disclosure and cover the invention in question.
The Agreements, (Exhibits 4, 5 6) recite a consideration of employment and continued employment. The invention in question is covered by paragraph 5 and that language alone would suffice to form the consideration for the assignments signed by the plaintiffs.
Further, the plaintiffs were employed and apparently happily so, at least as far as Johnson is concerned (see Exhibit 13) and Heath, who worked for Micropatent for 5 years until his discharge. Casillo's departure was not discussed.
In the case of Johnson, he argues he signed his second assignment after CT Page 13436-aj he left; Micropatent's employ. Hence, there could be no consideration for the 1995 signing. The weakness to that claim is that he had signed an assignment in 1994 when he was employed at Micropatent. The 1995 document was an update, so to speak, but Micropatent could rely on the earlier assignment as the basis for its title in the patent as against Johnson.
 III
The plaintiffs' other claim is that this patent is their property despite the documents referred to above because it was done on their own, off the Micropatent premises, and not "on the job."
This argument ignores the existence on all the pertinent documents of the two other inventors. It also fails to address the fact that it was created in addressing an employer problem — the need to do a better job in applying the labels to the CD's.
The plaintiffs also ignore the expenditure of Micropatent of $60,000 in patent development.
This claim is partially premised on the testimony of Johnson that work on this device was done after hours and the work day always ended at 5 o'clock. Heath testified that after work one day Johnson came up with the idea of using a jig. Casillo had this occur at lunch time. He also contradicted Johnson as to the work day and described extra shifts.
The trouble with all this is that at no time did the plaintiffs say to Micropatent that; the device was theirs and development should not proceed. The item was being used at Micropatent in completed form by the end of 1993. Subsequently, the Agreements and Assignment were executed.
Thus, even if there were merit to this claim, these subsequent executions eliminated any interest these plaintiffs might have had.
 Conclusion
Based on the foregoing, the court concludes there is no merit to the plaintiffs' defenses to the plaintiffs' counterclaim. It is found more than likely the defendants will prevail and their application for a prejudgment remedy should be and is granted.
Anthony V. DeMayo Judge Trial Referee CT Page 13436-ak